George HOWELL and Ella Cohoon Howell, Appellants,

v.

Henry Manford COHOON and Arthur Edward Cohoon, Respondents.

No. 48495.

Supreme Court of Missouri,

Division No. 1.

March 12, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied April 9, 1962.

Bradley & Noble, John W. Noble and Charles M. Cable, Kennett, for appellants.

Ward & Reeves, Caruthersville, for respondents.

WESTHUES, Judge.

This action was filed by plaintiffs George Howell and his wife Ella Howell to set aside a quit claim deed dated October 27, 1956. The grantees in the deed were defendants Henry Manford Cohoon and Arthur Edward Cohoon, sons of Ella and stepsons of George. The real estate conveyed by the deed was a 160-acre tract of land located in Pemiscot County, Missouri. Fraud in the procurement of the deed and mental incapacity on the part of Mrs. Howell were the bases upon which plaintiffs sought to have the deed set aside. The trial court found the issues in favor of the defendants. An appeal was taken to this court.

The following is a statement of the evidence introduced at the trial: Plaintiff Ella married Charles M. Cohoon in 1910. To this marriage were born two sons who are the defendants in this case. Cohoon died in 1941. Ella collected $8,000 in insurance on the life of her husband and purchased the 160-acre farm which is the subject matter of this lawsuit. The deed by which the property was conveyed to Ella Cohoon was dated February 10, 1942. The consideration stated in the deed was $15,-000. It was stated in the deed that it was given subject to a deed of trust in the sum of $4,250. In 1942, defendant Henry Manford Cohoon was 31 years of age and Arthur Edward Cohoon was 26. These sons rented the land from their mother until 1952 when the mother married George Howell. Ella testified that Arthur paid rent but that Henry Manford paid no rent and further that she signed notes for Henry Manford. It is evident from the record that the sons did not approve of their mother's marriage to George Howell. From 1952 to the time when this lawsuit was tried, the defendants were employed in the City of St. Louis. By deeds (dated June 11, 1956, and Septem-

ber 29, 1956) executed by plaintiffs, the title to the land was vested in the plaintiffs as an estate by the entirety.

On October 19, 1956, while plaintiffs were on their way home in a car and while plaintiff George was driving, the car left the main traveled portion of the roadway and crashed into a tree. Both plaintiffs were injured,—Ella rather seriously. They were taken to a hospital in Blytheville, Arkansas, where Ella remained for about two months and George for several weeks. On October 27, 1956, eight days after the plaintiffs were injured, the deed in question was executed. By this quit claim deed the land in question was conveyed to the defendants with a life estate reserved in favor of plaintiff Ella, the mother of defendants. The deed recited a consideration of "One Dollar and other good and valuable considerations." It was agreed that no money was paid to either of the plaintiffs for the deed.

Plaintiffs, to sustain their allegations of fraud, introduced evidence to the effect that plaintiff Ella was so seriously injured that she was unable to transact any business; that she was for all practical purposes unconscious during the first ten days after her injury. Plaintiffs further introduced evidence that plaintiff George Howell was induced to sign the quit claim deed on the representation made by defendants that the paper he signed was to procure money to pay hospital and medical bills. We shall review the substance of this evidence. Plaintiff Ella testified that she had no recollection of having signed the deed in question; that she did not remember acknowledging her signature as shown on the deed; and, further, that she did not remember any visitor being in her room until sometime after October 27, the day the deed was supposed to have been executed. Ella denied that she authorized the filing of a divorce petition which was filed while she was in the hospital; further, that her husband had always been kind to her and had never mistreated her in any way. After plaintiff Ella was discharged from the hospital, she,

within a few days, had the divorce petition dismissed. The first petition to set aside the deed was filed on December 31, 1956. The petition on which the case was tried was filed February 18, 1960.

Dr. John Q. Elliott, one of the doctors who treated both plaintiffs at the hospital, testified as a witness for plaintiffs. Dr. Hunter Sims, Jr., who also treated plaintiffs at the hospital, did not testify. Dr. Elliott described Ella's injuries and her condition as follows:

"A When they brought her into the hospital, she was in a car, they unloaded her out of the car, her left wrist was torn up, both bones were sticking out and her hand was just hanging on there, her mouth was caved in, her lip was split plumb up into her nose, back down on the side, her gum was fractured, she had a fractured kneecap, she had concussion of the brain, she was in a comatose condition. She had a fractured left ankle, too.

"Q Do you recall if she came into the hospital on the evening of the 19th of October, 1956?

"A Yes.

"Q Do you know about how long she remained as a patient in the hospital, roughly speaking?

"A Something better than two months, I believe.

"Q Now, Doctor, at the time you treated her there from the time she came in, you say she was in a coma or a state of unconsciousness, do you know about how long she remained in that state?

"A About ten days before we got any coherent answers out of her.

"Q In other words, did you see her any number of times during the period of ten days?

"A *Yes, I saw her every day.* (Emphasis supplied.)

"Q All right, sir. Doctor, now the injuries that you have described that Mrs. Howell has suffered from and that you treated and that you observed her while she was in the hospital every day, as you stated, let me ask you this question, if she executed a deed on the 27th of October, 1956, in your opinion, was she mentally competent or capable of understanding what she was doing?

"A No, she was not.

"Q She was not?

"A No."

The record shows that Dr. Elliott visited Mrs. Howell six times from October 19 to October 27, inclusive (October 19, 20, 21, 22, 24, and 27), and that Dr. Sims, Jr., visited her fifteen times during those days (once a day on October 19, 20, and 21; and twice a day on October 22, 23, 24, 25, 26, and 27).

Dr. Elliott described plaintiff George Howell's injuries as follows:

"A He had a fractured third, fourth, fifth, sixth rib on the left side, fracture of the left patella, I believe it was, compound fracture of the left patella, hemotoma of the left plural cavity, bleeding inside the plural cavity outside the lung, collapsed the lung.

"Q The lung collapsed?

"A Yes.

"Q Was there any fluid taken out of his side there?

"A Yes, twice, blood was drained out.

"Q I will ask you did he come to the hospital at the same time Mrs. Howell did?

"A Same time, yes.

"Q I'll ask you if on the 27th of October of 1956 whether or not in your opinion that he was mentally and physically able to know and transact business?

"A No, he was not."

Plaintiff George Howell testified that defendant Arthur Cohoon came to see him at the hospital and spoke of some insurance. He stated that on the day the alleged deed was signed, he was in a wheelchair and someone pushed him to his wife's room; that while there the following occurred:

"A Manford, sitting on the far side, I was sitting on this side and the lady they called Mrs. Young was standing at the dresser, the dresser was at the end of the room, he said, 'I want you to sign some papers.' I said, 'Well, I've got insurance.' I was feeling nervous and bad and all. He said, 'O, go ahead, that's all right, there ain't nothing to it, it is just to get some money.' I said, 'How much money?' He said, '$2,000.00 for Mom and two for you.'

"Q Who was this doing this talking?

"A That was Manford.

"Q Manford Cohoon?

"A Yes, sir.

"Q And were you handed a paper or document?

"A I was handed a piece of paper about this long (indicating).

"Q Did you sign it?

"A Yes, sir

"Q Did you read it before you signed it?

"A No, sir."

George Howell denied that anyone mentioned the signing of a deed and that he had no intention of conveying the land to the defendants. He further testified that he had at no time mistreated his wife.

The hospital records pertaining to the treatment of Mrs. Howell were introduced in evidence by plaintiffs as exhibit I and by the defendants as exhibit 3. This exhibit shows that narcotics for relief from pain were administered to Mrs. Howell at various times during her stay at the hospital. The hospital record shows that on October 26 morphine sulphate was given to Mrs. Howell at 2:00 p. m., and at 8:40 p. m.; on October 27, morphine sulphate was given at 1:45 a. m., and empirin with codeine was given at 5:15 p. m., and at 11:15 p. m.

The evidence on the part of the defendants was in sharp contrast to the evidence of plaintiffs. Albert King, who had been a tenant and lived on the land in question, testified for defendants. He stated that he arrived at the scene of the accident almost immediately after it occurred. He and his brother-in-law took plaintiffs to the hospital. He stated that he talked with Ella before they arrived at the hospital; that she gave him directions about taking care of things; that a few days later, she told him of three places at the home where she had hidden money in the amount of about $300; that he and Ella's son Arthur found the money where she had directed them to look. Elmer Dennis, the brother-in-law of King, corroborated King's evidence as to the conversation which occurred on the way to the hospital. Dennis further testified that he talked with Ella at the hospital a few days later.

Mrs. Georgia Hodge was Ella's private nurse for about seven weeks. She was on duty from 7:00 a. m., to 7:00 p. m., from October 24 to October 27, inclusive. She stated that she conversed with Ella every day; that Ella would introduce her to visitors; that Ella talked to her about getting a divorce; that she heard Ella give Albert King directions about the farm. This witness further testified that Mrs. Howell was not unconscious at any time and talked rationally.

Mrs. Lois Young was the office manager at the hospital; she was also a notary public. She testified that she notarized the deed in question. The substance of her evidence was that Mrs. Howell and Mr. Howell were told that they were signing a deed by which they were conveying the land to Ella's sons, reserving a life estate interest in the mother.

Mrs. Cora Taylor, 67 years old, and Mrs. Dessie Pearl Garrett, 77 years old, were witnesses. Their evidence was that they had known Ella for many years; that they were friends of Ella; that they visited Ella at the hospital and conversed with her; that they had no trouble understanding Ella and that she was normal as she had been during the years of their acquaintance. A number of other witnesses gave similar evidence of having conversed with Ella at the hospital before the day on which the deed was signed. In addition to that evidence, a number of witnesses testified to the effect that George Howell had mistreated Ella. Elmer Dennis, who lived on the farm in 1956, testified that he saw George Howell strike his wife and knock her down; that he had heard him curse her. Albert King, a tenant on the land in question for a number of years, also testified that George Howell had mistreated his wife and that he had seen him strike her.

The sons and their wives testified. From the evidence of the sons, it appears that after their mother married George Howell ill feeling developed. When the sons heard of their mother's injury, they immediately drove from St. Louis, Missouri, to Blytheville, Arkansas, to see their mother. Manford testified he did not go to her room until his mother asked for him; that he did not desire to go until asked because his mother had told him a few years previously that she did not wish to see him again. But after he was told his mother wanted to see him, he went to her and they were reconciled. He further stated that his mother insisted on conveying the land to him and his brother; further, that she insisted on getting a divorce and asked him

to have a deed prepared as well as a divorce petition; that he talked to Mr. Reeves, an attorney; that Mr. Reeves prepared the deed but told him he would not prepare a divorce petition; that his mother would probably change her mind. Note that the divorce petition was not filed until November 8, 1956. It was dismissed on December 20, 1956.

Mr. Reeves testified that he talked with Mrs. Howell before the petition was filed; that he dismissed it when she called him and asked that it be dismissed. The petition was signed and sworn to by Mrs. Howell before Mrs. Lois Young, the same person who notarized the quit claim deed. We have not discussed the evidence of a number of other witnesses. What has been said is sufficient to dispose of this case. There is no doubt that Mrs. Howell was seriously injured and perhaps her life was in danger for a few days. There is a sharp conflict in the evidence. The evidence of a number of witnesses for the defendants may be discounted because of their interest in the case. This was not a financial interest, but it appears that a number of witnesses disapproved of Ella's marriage to George Howell. It was shown that Ella was about ten years older than George Howell. Furthermore, it was in evidence that this was George's fifth marriage. Then, too, there was the evidence of the mistreatment of Ella by George. However, it is difficult to conceive how so many witnesses could be mistaken or would misstate the facts. Take for example the two women (67 and 77 years old) who were friends of Ella's: Why would they testify contrary to her wishes?

Considering plaintiffs' evidence, we find plaintiff Ella claimed she was not aware of having signed the deed. She is supported by only one witness, Dr. Elliott. His evidence, we confess, is difficult to understand in the face of the numerous witnesses testifying directly to the contrary. The hospital records, plaintiffs' exhibit I and defendants' exhibit 3, do not support Dr. Elliott. Note a number of the items in the record: On page 5 of the exhibit, there is a notation which was made on Sunday, October 21, at 7:15 a. m., "Awake and talking"; on page 11, October 24, at 7:00 p. m., "Patient states she is feeling much better"; on page 15, October 26, at 7:00 a. m., "awake talking" and at 10:30 p. m., "Talking"; and on October 27, (the day the deed was executed), at 6:30 a. m., "a good night" and at 7:00 p. m., two notes, "a good day" and "no complaints." We find no item in the hospital record that indicates that the patient was in a coma or was unconscious.

■ This is a case which clearly falls within that class of cases where an appellate court must give due deference to the findings of the trial court. 5A C.J.S. Appeal and Error § 1663, p. 589; Mueller v. Mueller, Mo., 318 S.W.2d 365, 1. c. 369(6, 7); Blackiston v. Russell, 328 Mo. 1164, 44 S.W.2d 22, 1. c. 26(7, 8); Ragan v. Schreffler, Mo., 306 S.W.2d 494, 1. c. 496(1); Southern Reynolds County School District R–2 v. Callahan, Mo., 313 S.W.2d 35, 1. c. 38(3); Herrold v. Hart, Mo., 290 S.W.2d 49, 1. c. 55(2–5).

■ Plaintiffs, in their brief, say the deed in question was a voluntary conveyance without consideration or intention to convey title. It must be remembered that the property in question was the property of the mother of the defendants until after her marriage when it was converted to an estate by the entirety. The record does not show that there was any money consideration given for the conversion. A conveyance from parent to child without any property consideration is valid and may not be set aside lightly. 26 C.J.S. Deeds § 18, pp. 613, 614; 67 C.J.S. Parent and Child § 60, p. 767; Blackiston v. Russell, supra, 44 S.W. 2d 22, 1. c. 27(17–19).

■ Plaintiffs further briefed the question of undue influence. They say that even though that issue was not presented by the pleadings it was presented by the evidence. We do not agree. Plaintiff Ella Howell

relied entirely on the claim that she was not conscious of having signed the deed. She testified she did not remember that her sons were at the hospital. Plaintiff George Howell relied entirely on fraud, claiming that he was made to believe he was signing a paper to obtain money from an insurance company.

Considering the evidence in its entirety, we have concluded that we should not set aside the judgment of the trial court.

The judgment is affirmed.

All concur.